\*\* E-filed April 20, 2011 \*\*

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FANG-YUH HSIEH, | No. C09-05455 HRL |
| Plaintiff, | **ORDER GRANTING DEFENDANTS', AND DENYING PLAINTIFF'S, MOTIONS FOR SUMMARY JUDGMENT** |
| v. | |
| STANFORD UNIVERSITY, et al., | |
| Defendants. | [Re: Docket Nos. 100, 116, 127, 131] |

**BACKGROUND**

The Department of Veterans Affairs's ("VA") Cooperative Studies Program ("CSP") plans and conducts large clinical trials. Through its five coordinating centers, the CSP provides statistical and administrative support to VA investigators conducting clinical trials. *Pro se* plaintiff Fang-Yuh "Frank" Hsieh ("Hsieh") was employed by one of those coordinating centers, the Veterans Affairs's Cooperative Studies Program Coordinating Center in Palo Alto, California ("Palo Alto VA-CSPCC"), as a mathematical statistician in a time-limited appointment from 1994 to 2002.

A. Hsieh's Previous Lawsuit ("Hsieh I")

Hsieh believed he was harassed and terminated in 2002 after he complained to his supervisor at the Palo Alto VA-CSPCC, Dr. Philip Lavori ("Lavori"), about discriminatory treatment. Hsieh sued the VA and Lavori in 2006 for violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") and the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"), based on the alleged discriminatory treatment, the failure to reinstate him as a

mathematical statistician, and the failure to hire him for another position in 2005. The court in that case dismissed Hsieh's claims against Lavori and granted summary judgment in favor of the VA. See Hsieh v. Peake, et al., No. C06-05281 PJH, 2008 WL 783370 (N.D. Cal. 2008), aff'd by 342 Fed.Appx. 295 (9th Cir. 2009) ("Hsieh I").

B. Hsieh's Instant Lawsuit ("Hsieh II")

In November 2009, Hsieh filed a second lawsuit for violations of Title VII and the ADEA, this time against the VA, Lavori, and Stanford University ("Stanford"), where Lavori is now professor of biostatistics and chair of the Department of Health Research and Policy. Docket No. 1. This Court previously dismissed Hsieh's claims against Lavori with prejudice and so only the VA and Stanford remain as defendants. Docket No. 45.

Hsieh's Title VII and ADEA claims against the VA involve three positions for which he applied in 2009. The jobs and the dates he applied for them are as follows: (1) a statistician position at the VA Center for Health Care Evaluation (the "VA Center for Health Care Evaluation Position"), May 1, 2009; (2) a mathematical statistician position at the Palo Alto VA-CSPCC (the "Palo Alto VA-CSPCC Position"), June 5, 2009; and (3) a statistician position at the VA Office of Public Health Surveillance and Research (the "VA-OPHSR Position"), August 5, 2009.

Hsieh's ADEA claims against Stanford involve three positions for which he applied in 2008 and 2009. They are: (1) a biostatistician position (the "Stanford Biostatistician Position"), September 17, 2008; (2) a data analyst position (the "Stanford Data Analyst Position"), October 3, 2009; and (3) a statistical analyst position (the "Stanford Statistical Analyst Position"), November 24, 2009.[1]

Hsieh also brings a claim against both the VA and Stanford that involves a joint position as a faculty member in Stanford's Department of Health Research and Policy and as the director of the Palo Alto VA-CSPCC (the "Joint VA/Stanford Position"). He alleges that he applied for this position on or about May 3, 2009 by emailing his application materials to Lavori.

---

[1] The Court previously dismissed with prejudice Hsieh's Title VII claims against Stanford. Docket No. 45.

2

The parties filed cross-motions for summary judgment. Docket Nos. 100 ("Stanford SJ Motion"), 116 ("Hsieh Stanford SJ Motion"), 127 ("Hsieh VA SJ Motion"), 131 ("VA SJ Motion"). Oral argument was heard on February 22, 2011.

## LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c)(2)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In order to meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. See FED. R. CIV. P. 56(e)(2); Nissan Fire & Marine Ins. Co., Ltd., 210 F.3d at 1102. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. See id. A genuine issue of fact is one that could reasonably be resolved in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. Anderson, 477 U.S. at 248-49.

## DISCUSSION

A. Applicable Law

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). It is also unlawful for an employer to retaliate against an employee for opposing an unlawful employment practice or making a charge in an employment discrimination investigation or

3

1   proceeding. 42 U.S.C. § 2000e-3(a); see also Lam v. Univ. of Hawai'i, 40 F.3d 1551, 1558-59 (9th
2   Cir. 1994).

3     Under the ADEA, it is "unlawful for an employer . . . to fail or refuse to hire . . . any
4   individual [who is at least 40 years of age but less than 70] . . . because of such individual's age." 29
5   U.S.C. §§ 623(a), 631(a); see also Cotton v. City of Alameda, 812 F.2d 1245, 1247 (9th Cir. 1987).
6   However, an employer does not violate the ADEA when it hires one individual over another "where
7   the differentiation is based on reasonable factors other than age . . . ." 29 U.S.C. § 62(f).

8     The burdens of proof and persuasion are the same for Title VII and ADEA discrimination
9   claims. Rose v. Wells Fargo & Co., 902 F.2d 1417, 1420 (9th Cir. 1990) ("The shifting burden of
10  proof applied to a Title VII discrimination claim also applies to claims arising under ADEA.").
11  Retaliation claims are also included within this framework. Miller v. Fairchild Industries, Inc., 885
12  F.2d 498, 504 n.4 (9th Cir. 1989); Yartzoff v. Thomas, 809 F.2d 1371, 1375 (9th Cir. 1987).

13    The burden-shifting process is as follows: "'[A] plaintiff must first establish a *prima facie*
14  case of discrimination. If the plaintiff establishes a *prima facie* case, the burden then shifts to the
15  defendant to articulate a legitimate nondiscriminatory reason for its employment decision. Then, in
16  order to prevail, the plaintiff must demonstrate that the employer's alleged reason for the adverse
17  employment decision is a pretext for another motive which is discriminatory.'" Wallis v. J.R.
18  Simplot Co., 26 F.3d 885, 890 (9th Cir. 1994) (quoting Lowe v. City of Monrovia, 775 F.2d 998,
19  1005 (9th Cir. 1985)).

20    "A *prima facie* case of unlawful employment discrimination on the basis of protected
21  characteristics may be established through indirect evidence under the familiar McDonnell Douglas
22  four-part test." Lam, 40 F.3d at 1559 (citations omitted). "In McDonnell Douglas, the Supreme
23  Court held that the plaintiff can make out a *prima facie* case by showing that (1) he or she belongs
24  to a protected class, (2) he or she applied for and was qualified for a job for which the employer was
25  seeking applicants, (3) despite being qualified, he or she was rejected, and (4) after his or her
26  rejection, the position remained open and the employer continued to seek applicants from people of
27  comparable qualifications. Id. (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802
28  (1973)).

"Once a *prima facie* case has been made, the burden of production shifts to the defendant, who must offer evidence that the adverse action was taken for other than impermissibly discriminatory reasons. Once the defendant fulfills this burden of production by offering a legitimate, nondiscriminatory reason for its employment decision, the McDonnell Douglas presumption of unlawful discrimination 'simply drops out of the picture.'" Wallis, 26 F.3d at 890 (citations omitted).

"[I]n deciding whether an issue of fact has been created about the credibility of the employer's nondiscriminatory reasons, the district court must look at the evidence supporting the *prima facie* case, as well as the other evidence offered by the plaintiff to rebut the employer's offered reasons. And, in those cases where the *prima facie* case consists of no more than the minimum necessary to create a presumption of discrimination under McDonnell Douglas, plaintiff has failed to raise a triable issue of fact." Id. at 890.

"Thus, the mere existence of a *prima facie* case, based on the minimum evidence necessary to raise a McDonnell Douglas presumption, does not preclude summary judgment. Indeed, in Lindahl v. Air France, 930 F.2d 1434, 1437 (9th Cir. 1991), [the Ninth Circuit] specifically held 'a plaintiff cannot defeat summary judgment simply by making out a prima facie case.' '[The plaintiff] must do more than establish a prima facie case and deny the credibility of the [defendant's] witnesses.' In response to the defendant's offer of nondiscriminatory reasons, the plaintiff must produce 'specific, substantial evidence of pretext.' In other words, the plaintiff 'must tender a genuine issue of material fact as to pretext in order to avoid summary judgment.'" Id. (citations omitted).

B. The Three VA Positions

    1. The VA Center for Health Care Evaluation Position

A job opening at the VA Center for Health Care Evaluation was posted in April 2009. Docket No. 132 ("Sox-Harris Decl.") ¶ 7, Ex. B. Although the opening was for a "statistician," the VA wanted to hire a data analyst for Dr. Alexander Sox-Harris's research team. Id. ¶ 4. The analyst's primary duties would be to query large databases and construct datasets using statistical programs, such as SAS, R, and SPSS, and database programs, such as MS Access and SQL, under

Sox-Harris's direction. Id., Ex. A. More sophisticated statistical analyses would be conducted by other members of the research team. Id. ¶ 4. Accordingly, Sox-Harris sought a "worker bee"-type of SAS programmer to fill the position. Id.

Hsieh applied for the position, and the VA's human resources office referred three candidates, including Hsieh, to Sox-Harris for consideration. Docket No. 134 ("Trefault Decl.") ¶ 8; Sox-Harris Decl. ¶ 8, Ex. E.

Sox-Harris did not select Hsieh for the position. Sox-Harris Decl. ¶ 9. In his declaration, Sox-Harris stated that he did not select Hsieh because he "sought a career data analyst who was actively involved in the primary duties required by the position — querying databases to construct datasets — and [Hsieh's] application materials reflected that his more recent experience was managerial and supervisory in nature." Id. Instead, he selected David Wright, whose application materials showed that his most recent job involved "exactly those duties required by the position," and that he had "done this work for a long time." Id. Wright also "had the computer programming skills . . . needed to develop user interfaces" for the VA's databases. Id.

Hsieh's discrimination claim fails. He attacks Wright's qualifications and touts his own, but he submits no admissible evidence whatsoever to dispute Sox-Harris's evaluation that Wright, and not Hsieh, had the skills required for the position.[2] Instead, Hsieh's relies exclusively on his own subjective personal opinion in this regard, but Hsieh's personal opinion alone is not sufficient to raise a genuine issue of material fact. Schular v. Chronical Broadcasting Co., Inc., 793 F.2d 1010, 1011 (9th Cir. 1986) (citing Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980)). As the Ninth Circuit has made clear, "[t]he question is not whether [a plaintiff] in the abstract had better

---

[2] In their opposition briefs to Hsieh's motions for summary judgment, their reply briefs in support of their own motions for summary judgment, and other papers, the VA and Stanford object to many of Hsieh's statements in his various declarations. Docket Nos. 145 ("Stanford Opposition") at 4-8; 149 ("VA Opposition") at 3-4, 6 n.5, 7 n.7, 10 n.9, 11, 14, 17 n.11, 19, 20 n.12, 25 n.14; 156 ("Stanford Reply") at 2-6; 162 ("VA Reply") at 3 n.2, 4 n.3, 9 n.7, 10 & n.9, 14, 15 n.10; 166 ("Stanford Objections") at 1; 169 ("VA Objections") at 2; 170 ("Supp. Stanford Objections") at 2-4; see Docket Nos. 120 ("Hsieh Stanford Opp'n Decl."); 128 ("Hsieh VA Decl.")153 ("Hsieh VA Opp'n Decl."); 155 ("Hsieh Stanford Decl."); 160 at 9 ("Hsieh VA Reply Decl."); 161 at 8 ("Hsieh Stanford Reply Decl."); 168 ("Hsieh Supp. Decl."). They object on numerous grounds, including lack of personal knowledge, lack of foundation, hearsay, and improper lay opinion. Upon review of Hsieh's declarations, the Court believes that their objections are proper. Accordingly, the Court strikes those portions of Hsieh's declarations to which they objected.

qualifications than the other candidates," it "is whether the other candidates are more qualified with respect to the criteria that [the defendant employer] actually employs." Cotton, 812 F.2d at 1249; see also Smith, 618 F.2d at 1067 (it is the perception of the decision maker which is relevant, not the plaintiff's "perception of himself"). In addition, Hsieh has not submitted any admissible evidence to suggest that Sox-Harris's explanation for his selection of Wright was pretextual.

Hsieh's retaliation claim likewise fails. Sox-Harris stated that he did not know of Hsieh's prior complaints against Lavori when he selected Wright for the position (Sox-Harris Decl. ¶ 12), and Hsieh presents no evidence to the contrary.

Accordingly, the VA's motion for summary judgment is GRANTED (and Hsieh's motion for summary judgment is DENIED) as to Hsieh's discrimination and retaliation claims with respect to the VA Center for Health Care Evaluation Position.

2.   The Palo Alto VA-CSPCC Position

In late 2008, the Palo Alto VA-CSPCC expected to have additional funding for its DNA bank project, so it sought to hire a mathematical statistician. Docket No. 135 ("Holodniy Decl.") ¶¶ 4-5. In January 2009. it requested that an announcement for this position be posted, and it was eventually posted four months later in May 2009. Id. ¶ 5. Hsieh applied for this position in June 2009. Trefault Decl. ¶ 10.

By this time, however, the future role of the DNA bank project had become hazy and the Palo Alto VA-CSPCC did not have sufficient work to justify hiring a new statistician. Holodniy Decl. ¶7. Around the same time, it became known that the Palo Alto VA-CSPCC would have a new director. Id. For these reasons, Dr. Holodniy, the acting director at the time, decided to withdraw the opening for the position. Id. No applicants were ever considered the position and no interviews took place. Id. ¶ 8. Rejection letters were sent to all applicants stating that "management decided not to fill the position at this time, due to lack of [r]esearch funding." Trefault Decl. ¶ 11, Ex. G; see Docket No. 136 ("Lee Decl."), Ex. A.

Hsieh argues that the cancellation of the position was pretextual, but none of his arguments are persuasive or supported by admissible evidence; rather, they are based on hearsay and uncorroborated statements. The fact is that Hsieh applied for a position that was later withdrawn and

7

no one was considered, interviewed, or hired for it. Accordingly, the VA's motion for summary judgment is GRANTED (and Hsieh's motion for summary judgment is DENIED) as to Hsieh's discrimination and retaliation claims with respect to the Palo Alto VA-CSPCC Position.

### 3. The VA-OPHSR Position

In August 2009, the VA-OPHSR expected to receive certain data later that Fall and so it posted a job announcement for a statistician. Holodniy Decl. ¶¶ 11-13, Ex. D. Hsieh applied for the position, and he, and two others, were telephonically interviewed for it by a VA-OPHSR selection committee. Docket No. 137 ("Oda Decl.") ¶¶ 4-6; Docket No. 138 ("Lopez Decl.") ¶ 6; Docket No. 139 ("Lucero Decl.") ¶ 6; Docket No. 140 ("Backus Decl.") ¶ 6.

After the interviews, the committee unanimously favored Dr. Ilana Belitskaya-Levy, and they offered the position to her in October 2009.[3] Oda Decl. ¶ 6; Lopez Decl. ¶ 6; Lucero Decl. ¶ 6; Backus Decl. ¶ 6; Holodniy Decl. ¶ 17. The committee members did not choose Hsieh because they believed him to be less qualified than Belitskaya-Levy.[4] Oda Decl. ¶ 8; Lopez Decl. ¶ 8; Lucero Decl. ¶ 8; Backus Decl. ¶ 8.

---

[3] In their declarations, the committee members stated that they selected Belitskaya-Levy because she: (1) provided specific examples of her approach to handling complex issues in statistical research; (2) gave detailed explanations of how her skills and previous work were applicable to the types of projects being performed by the VA-OPHSR; (3) displayed more knowledge than the other candidates of statistical applications specific to the field of biosurveillance; (4) provided a more thorough explanation than the other candidates of how she would approach the analysis of VHA data; (5) had the ability to explain statistical concepts and projects in a detailed, understandable way; (6) had extensive experience with healthcare-related statistical analyses; (7) had more relevant experience with contracting, procurement and long range program planning than the other candidates; (8) had been very successful in obtaining funding for her research from a variety of sources; and (9) had a strong record of publishing recent work in peer reviewed journals and of presenting at national scientific meetings. Oda Decl. ¶ 7, Lopez Decl. ¶ 7, Lucero Decl. ¶ 7, Backus Decl. ¶ 7. The committee considered all of these qualities to be critical for the position. Lucero Decl. ¶ 7.

[4] Specifically, the committee members did not select Hsieh because: (1) they did not believe Hsieh's interview responses demonstrated his ability to design and plan statistical analyses as a lead statistician for the VA-OPHSR; (2) he was unable to explain how he would approach complex problems where he also would have to take into account the theoretical nature of statistical research and its potential impact on decision and policy-making; (3) he did not clearly explain how his past experience applied to the types of projects being performed by the VA-OPHSR (such as biosurveillance); (4) he did not exhibit an ability to discuss and explain statistical concepts or projects in a detailed, understandable way to less statistically-educated members of the VA-OPHSR and its research partners; and (5) his application materials showed that he did not have a record of recent publications in peer-reviewed journals or presentations at scientific meetings. Oda Decl. ¶ 8; Lopez Decl. ¶ 8; Lucero Decl. ¶ 8; Backus Decl. ¶ 8.

Belitskaya-Levy turned down the offer in November 2009. Holodniy Decl. ¶ 17. By that time, however, the VA-OPHSR had not received the data it had expected to, nor had it received other prerequisites. Id. ¶ 18. In light of this, the VA-OPHSR ended its efforts to hire a full time statistician. Id. In fact, to date, no data has been received and no one has ever been hired. Id.

Hsieh's discrimination claim fails. He maintains that he was more qualified than Belitskaya-Levy, but again he offers no admissible evidence to support this claim. He also argues that, after Belitskaya-Levy declined the offer, the VA-OPHSR modified the position to make it one for an epidemiologist rather than a statistician (so as to avoid hiring him), but the evidence he cites does not support this assertion.[5]

His retaliation claim also fails. None of the committee members knew about Hsieh's prior complaints about Lavori or the VA. Oda Decl. ¶ 9; Lopez Decl. ¶ 9; Lucero Decl. ¶ 9; Backus Decl. ¶ 9. Hsieh presents no genuine issue of material fact as to this claim.[6]

Accordingly, the VA's motion for summary judgment is GRANTED (and Hsieh's motion for summary judgment is DENIED) as to Hsieh's discrimination and retaliation claims with respect to the VA-OPHSR Position.

C. The Three Stanford Positions

1. The Stanford Biostatistician Position

Dr. Mark Hlatky, a professor in the Department of Health Research and Policy at Stanford, was responsible for hiring someone for the Biostatistician Position. Docket No. 105 ("Hlatky Decl.") ¶¶ 1-2. Hsieh was one of twenty-three individuals who applied for the position. Id. ¶ 3. Hlatky conducted the initial screening of the applications and selected six applicants for interview.

---

[5] Hsieh cites an October 19, 2009 email between Holodniy and Lavori discussing Belitskaya-Levy. See Docket No. 128, Ex. D. Nothing in this email supports Hsieh's assertion that the VA-OPHSR wanted to avoid hiring him.

[6] Hsieh cites a September 9, 2009 email in which Robert Trefault, a human resources manager, mentioned that Hsieh called numerous individuals about the position. See Docket No. 153, Ex. B. In the email, Trefault surmised that Hsieh made these telephone calls "to get an 'in' or help build a case." Hsieh suggests that Trefault's use of the phrase "build a case" referred to Hsieh's legal actions, but it is clear from this email that Trefault meant the phrase to refer to Hsieh's application for the position. In other words, Hsieh was trying to garner support for his application. Moreover, nothing in this email contradicts the committee members' statements that they did not know about Hsieh's prior complaints about Lavori or the VA.

9

Id. ¶¶ 4-5. Hlatky did not select Hsieh for an interview. Id. ¶ 4. After interviewing the six, Hlatky selected David Shilane (admittedly, younger than Hsieh), and Shilane was hired in December 2008 after receiving final approval from Lavori.[7] Id. ¶ 6.

Stanford asserts that Shilane was more qualified for the Biostatistician Position than Hsieh. In his declaration, Hlatky said he wanted an applicant who had experience with cutting-edge, sophisticated analysis techniques for observational data, someone who could "apply advanced statistical approaches in the analyses of large longitudinal databases," and would "use a variety of statistical analysis methods." Id. ¶ 5. Shilane had been working with and trained by professionals whom Hlatky knew and held in high esteem on account of their cutting-edge analysis techniques. Id. ¶ 6. Hlatky believed that Hsieh, on the other hand, had more experience in management and in conducting more standard statistical analyses of clinical trials. Id. ¶ 5.

Hsieh does not refute Stanford's evidence. Instead, he simply says that he met all of the qualifications for the job and that Shilane is younger than him. But as explained above, Hsieh's own subjective personal opinion as to his skills is not sufficient to raise a genuine issue of material fact. Cotton, 812 F.2d at 1249; Schular, 793 F.2d at 1011; Smith, 618 F.2d at 1067. And without any admissible evidence that he was qualified for the position as determined by Hlatky, Hsieh does not show that Hlatky's reason for hiring Shilane was a pretext, as a difference in age alone is not sufficient to show discrimination. See Lopos v. Ruocco, 99 F.Supp.2d 207, 208 (D. Conn. 2000).

Hsieh's retaliation claim fails as well. While Hlatky — the only person who ever saw Hsieh's application — knew that Hsieh had previously worked at the VA, he did not know of Hsieh's prior complaints against Lavori until he was contacted by counsel after this action had been filed. Hlatky Decl. ¶ 7. Hsieh does not submit any evidence to refute this.[8]

---

[7] While Hlatky's choice for the position was subject to final approval of Lavori, Lavori was not involved in the initial screening of the applicants; did not review any applications that were not selected for interviews; and, accordingly, never saw Hsieh's application. Hlatky Decl. ¶ 4.

[8] Hsieh makes much of an email from Hlatky to Lavori in which Hlatky mentioned with respect to the Biostatistician Position: "ps[:] One of the resumes is from Frank Hsieh, who you know . . . ." Hsieh Stanford Opp'n Decl., Ex. B (ellipses in original). But even if this email could be read to suggest that Hlatky did not want to hire Hsieh because he believed that Lavori did not like him (as Hsieh suggests), it does not support Hsieh's retaliation claim because it does not tend to show that Hlatky retaliated against Hsieh because of Hsieh's prior complaints against Lavori or that Hlatky even knew about them.

10

Accordingly, Stanford's motion for summary judgment is GRANTED (and Hsieh's motion for summary judgment is DENIED) as to Hsieh's discrimination and retaliation claims with respect to the Stanford Biostatistician Position.

### 2. The Stanford Data Analyst Position

In May 2008, Stanford posted an opening for the Data Analyst Position. Docket No. 103 ("Rosenthal Decl.") ¶ 2. Dr. David Rosenthal ("Rosenthal") was responsible for screening applicants and hiring for the position. Id. Pauline Prater ("Prater"), an administrative manager at Stanford, monitored the applications for the position and, without screening them, forwarded them to Rosenthal for his review. Id. ¶ 3; Docket No. 104 ("Prater Decl.") ¶ 2. Over 400 individuals applied for the job, and Prater stopped forwarding applications to Rosenthal on July 27, 2009 (by which time over 300 applications already had been received). Prater Decl. ¶¶ 2, 3. Hsieh did not apply until October 3, 2009, so Rosenthal never saw — and thus did not ever consider — his application. Rosenthal Decl. ¶ 4; Prater Decl. ¶ 3, Ex. 1. Another applicant was hired for the position. Rosenthal Decl. ¶¶ 5-6.

Hsieh's discrimination claim fails. While Hsieh claims that he was told by an unnamed Stanford human resources representative that all candidates who applied for the position while the job was posted would be considered for the position, this statement is hearsay and completely unsubstantiated. But even if it was admissible as evidence, it would not matter because it does not tend to show that Stanford's nondiscriminatory reason for failing to hire Hsieh was a pretext. The reality is that Hsieh submitted his application after Prater stopped forwarding new applications for the position to Rosenthal. In such a circumstance, Hsieh cannot show that he was discriminated against on the basis of age.

Hsieh's retaliation claim also fails. Neither Rosenthal nor Prater — the only persons involved with the applications for and the hiring for this position[9] — knew of Hsieh's prior complaints against Lavori until they were contacted in February 2010 in connection with this action, which was after the position had already been filled. Rosenthal Decl. ¶¶ 7-8; Prater Decl. ¶ 4.

---

[9] Lavori had no involvement in the screening or hiring for this position. Rosenthal Decl. ¶ 2; Docket No. 102 ("Lavori Decl.") ¶ 10.

11

Accordingly, Stanford's motion for summary judgment is GRANTED (and Hsieh's motion for summary judgment is DENIED) as to Hsieh's discrimination and retaliation claims with respect to the Stanford Data Analyst Position.

### 3. The Stanford Statistical Analyst Position

For the Statistical Analyst Position, Stanford sought an applicant who had: (1) a master's degree in statistics, biostatistics, or a related field; (2) at least two years of experience manipulating large databases and doing data analysis; (3) strong oral and written communication skills; (4) an ability to work independently and collaboratively; and (5) experience with multiple statistical languages such as SAS and R. Docket No. 106 ("Desai Decl.") ¶ 3.

Dr. Manisha Desai ("Desai") was responsible for conducting the initial screening of applicants for this position. Id. ¶ 4. She reviewed the applications and created a list of twenty applicants whose applications would be reviewed by a four-person search committee and from which the successful applicant would be chosen. Id. Hsieh applied for this position, but Desai did not select him for the list of twenty applicants because she believed that he (1) was overqualified by virtue of his Ph.D. in statistics, (2) had experience mainly in managerial roles, and (3) did not appear to have worked as a statistical programmer. Id. ¶¶ 5-6.

In any event, the position for which Hsieh applied was cancelled by Stanford because Desai wanted to revise the qualifications. Id. ¶ 9. She realized that, among the twenty applicants she selected for review by the search committee, fewer than half of them had at least two years of experience manipulating large databases and doing data analysis (including her top choice for the job, Jessica Kubo). Id. ¶ 10. So, Desai cancelled the job posting and then re-posted it with the qualifications revised to require only one year of such experience. Id. Applicants were required to apply for this new posting even if they had applied for the previous one. Id. Nineteen individuals applied for this new position, but Hsieh did not. Id. Kubo, who applied for both positions and is younger than Hsieh, ultimately got the job. Id. ¶¶ 7, 10.

While Hsieh points out that his application claimed that he was familiar with statistical programming languages such as SAS and R, he has not submitted any evidence suggesting that

12

1  Desai's decision not to select him had anything to do with his age or was a pretext. His
2  discrimination claim therefore fails.

3  Hsieh also fails to make a *prima facie* case of retaliation with respect to this position. Desai
4  — the only person who saw Hsieh's application — did not know of Hsieh's prior complaints against
5  Lavori until she was contacted in February 2010 in connection with this action, which was after the
6  position had already been filled.[10] Desai Decl, ¶ 11.

7  Accordingly, Stanford's motion for summary judgment is GRANTED (and Hsieh's motion
8  for summary judgment is DENIED) as to Hsieh's discrimination and retaliation claims with respect
9  to the Stanford Statistical Analyst Position.

10  D.  The Joint VA/Stanford Position

11  In 2007 the VA and Stanford began to search for a tenure line faculty member in the area of
12  biostatistics or clinical trials, who would hold both an appointment as faculty member at Stanford
13  and as the director of the Palo Alto VA-CSPCC. Docket No. 133 ("Huang Decl.") ¶ 3; Lavori Decl.
14  ¶ 3. Applicants were required to complete separate selection processes, and the successful candidate
15  had to be approved by both Stanford and the VA. Huang Decl. ¶ 3; Lavori Decl. ¶ 3.

16  Stanford formed a nine-member search committee of faculty members, with Lavori as co-
17  chair, to oversee Stanford's hiring process for the Joint VA/Stanford Position (the "Search
18  Committee"). Lavori Decl. ¶ 3. Twenty-two candidates applied for position — the latest of which
19  (apart from Hsieh) submitted an application on February 29, 2008. Id. ¶ 4. The Search Committee
20  narrowed the candidates down to two, and it forwarded these two candidates' materials — including
21  those of Dr. Ying Lu ("Lu") — to Drs. Grant Huang and Timothy O'Leary of the VA. Huang Decl.
22  ¶ 4. On July 21, 2008, the VA notified the Search Committee that it selected Lu as its preferred
23  choice for the position. Huang Decl. ¶ 4; Lavori Decl. ¶ 5. The Search Committee approved the
24  VA's preference for Lu and recommended him for the job, and Lavori notified Lu of this
25  development. Lavori Decl., ¶¶ 5-6, Ex. 1. Later, on January 26, 2009, Stanford faculty members
26  voted unanimously in support of the Search Committee's recommendation of Lu. Id. ¶ 7. The next

---

[10] Lavori did not have anything to do with the hiring for this position. Desai Decl. ¶ 12.

13

day, Lavori notified Lu that the Stanford faculty had voted in favor of his appointment for the Joint VA Position and that internal sign-offs for the faculty appointment would take some time. Id., Ex. 2.

Before Lu could obtain the concurrent position with the VA, his eligibility for the position needed to be confirmed through the VA's formal hiring process. Huang Decl. ¶ 5. This process, which is overseen by the VA's Delegated Examining Unit ("DEU"), ensures that a successful candidate has the minimum knowledge and skills in the areas required for an open position and meets any applicable statutory or regulatory eligibility requirements. Trefault Decl. ¶ 4. When a unit within the VA seeks to fill an appointment, it requests that the DEU post a job announcement. Id. ¶ 5. Once the DEU posts the announcement and applicants apply for the job, the DEU (1) scores the applicants based on their responses to a self-assessment questionnaire, (2) assesses whether any applicants are entitled to a veterans' preference, and (3) creates a Certificate of Eligibles, which lists the qualified applicants by score. Id. The DEU then sends the Certificate of Eligibles to the requesting VA unit for consideration by the individual responsible for selecting a candidate. Id. The top three candidates must be given first consideration, and, generally, a non-veteran may not be selected if there is a qualified candidate entitled to a veterans' preference. Id.

This process also allows the hiring VA unit to recruit specific candidates to apply for the position. Id. ¶ 7. For example, the DEU allows the individual responsible for selecting the candidate to provide a "name request," which is the name of a candidate who was encouraged to apply. Id. When the DEU creates the Certificate of Eligibles, a "name request" serves a tie-breaker, and the "name request" candidate is ranked ahead of other candidates with the same score. Id. A "name request," however, has no effect on the candidates' score aside from this tie-breaking function. Id.

In accordance with this formal hiring process, the VA requested in early April 2009 that a job announcement for the position be posted, and Lu submitted his application materials for it around April 20, 2009. Id. ¶ 9. Lu, a "name request," was one of the top three candidates according to the Certificate of Eligibles created by the DEU. Id., Ex. D. After receiving confirmation of Lu's eligibility for the position, the VA selected him on May 5, 2009. Id. ¶ 9. On May 12, 2009, Lavori sent a letter to Lu offering him the Joint VA/Stanford Position, which Lu accepted on May 18, 2009. Lavori Decl. ¶ 8, Ex. 3.

14

Months after the Stanford faculty members had voted to offer the tenured faculty position to Lu and just two days before the VA selected him for the position of director of the Palo Alto VA-CSPCC, Hsieh purportedly applied for the Joint VA/Stanford Position by sending Lavori an email on May 3, 2009. Lavori Decl. ¶¶ 4-9. Since Hsieh applied so late — indeed, Lu accepted the position two weeks later — Stanford did not consider Hsieh application. Id. ¶ 9. And since Hsieh never applied to the VA (and Stanford never forwarded his application to the VA), the VA never considered Hsieh for the position, either. Huang Decl. ¶ 6; Docket No. 141 ("Wang Decl."), Ex. A. ("Hsieh Deposition") at 60:6-21. In short, Hsieh was simply too late.

Hsieh's claims of discrimination are unpersuasive. He says that the VA's and Stanford's prior identification of a candidate before the VA position was posted violated VA policy and thus demonstrates discriminatory intent, but he does not cite any such policy nor explain how this was discriminatory. In fact, the evidence submitted suggests that listing Lu as a "name request" was perfectly acceptable. Hsieh also says that nothing in the postings for the position explained that an applicant had to apply to both the VA and Stanford, but this does not prove anything since Hsieh failed to timely apply to either of them.[11] The fact is that Lu had already been selected by the time Hsieh applied. Accordingly, the VA's and Stanford's motions for summary judgment are GRANTED (and Hsieh's motions for summary judgment is DENIED) as to Hsieh's discrimination claims with respect to the Joint VA/Stanford Position.

Hsieh also fails to make a *prima facie* case of retaliation with respect to this position. He argues that because the VA was a defendant in the prior litigation, they were aware of his complaints against Lavori. Hsieh also says that Lavori "blackballed" him by deleting his May 3, 2009 email that included his application materials and by not forwarding those materials to the VA. However, these arguments are irrelevant because Hsieh never applied to the VA and his email to Lavori containing his application materials was untimely anyway (assuming that he could apply by sending Lavori an email). Accordingly, the VA's and Stanford's motions for summary judgment are

---

[11] Hsieh also states that he was told by an unidentified Stanford human resources representative that all applicants would be considered, but this statement is hearsay and completely unsubstantiated.

GRANTED (and Hsieh's motions for summary judgment are DENIED) as to Hsieh's retaliation claim with respect to the Joint VA/Stanford Position.

## CONCLUSION

Based on the foregoing, the VA's and Stanford's motions for summary judgment are GRANTED in their entirety, and Hsieh's motions for summary judgment are DENIED in their entirety.

**IT IS SO ORDERED.**

Dated: April 20, 2011

HOWARD R. LLOYD
UNITED STATES MAGISTRATE JUDGE

**C09-05455 HRL** **N**otice will be electronically mailed to:

| | |
|---|---|
| Ana N. Damonte | ana.damonte@pillsburylaw.com, docket@pillsburylaw.com |
| Jennifer S Wang | jennifer.s.wang@usdoj.gov, bonny.wong@usdoj.gov, lily.c.ho vuong@usdoj.gov, wilson.wong@usdoj.gov |
| Rosa Maria Loya | rosa.loya@gmail.com |
| Sarah G. Flanagan | sarah.flanagan@pillsburylaw.com, docket@pillsburylaw.com, susie.macken@pillsburylaw.com |

**Notice will be provided by other means to:**

Fang-Yuh Hsieh
1394 University Avenue
Palo Alto, CA 94301

**Counsel are responsible for distributing copies of this document to co-counsel who have not registered for e-filing under the court's CM/ECF program.**